CINCINNATI BAR ASSOCIATION *v*. SIGALOV.

[Cite as *Cincinnati Bar Assn. v. Sigalov,* 133 Ohio St.3d 1, 2012-Ohio-3868.]

*Attorneys—Misconduct—Multiple violations of Code of Professional Responsibility and Rules of Professional Conduct—Neglect, incompetence, misrepresentation, and causing damage to clients— Disbarment.*

(No. 2011-0120—Submitted April 19, 2011—Decided August 28, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 11-120.

_____

**Per Curiam**.

{¶ 1} Respondent, Vlad Sigalov of Cincinnati, Ohio, Attorney Registration No. 0070625, was admitted to the practice of law in Ohio in 1999.

{¶ 2} Sigalov is a sole practitioner engaged in a practice centering on personal-injury, immigration, and criminal cases. He accepts approximately 1,000 individual claims per year, and as recently as 2009, earned more than $2.5 million in gross settlement revenues and approximately $800,000 in fees.

{¶ 3} Relator, Cincinnati Bar Association, filed a second amended complaint[1] with the Board of Commissioners on Grievances and Discipline, setting forth seven counts of misconduct. The seven counts alleged that Sigalov violated the Rules of Professional Conduct and the Code of Professional Responsibility in the course of representing five clients in personal-injury matters and three clients in immigration cases.

_____

1. The first complaint set forth three counts, but as the scope of Sigalov's misconduct became clear, amended complaints were filed. The amended complaint set forth five counts. The second amended complaint, which is at issue here, set forth seven counts.

**{¶ 4}** A panel of the board conducted several hearings on the complaint. The hearings included the testimony of Sigalov, the complainants, and relator's expert witness on immigration law, Douglas Weigle.

**{¶ 5}** Although certain allegations of misconduct were dismissed, the panel and board found by clear and convincing evidence that Sigalov had committed numerous disciplinary violations in the course of representing several clients. Specifically, the panel and board concluded that he had violated Prof.Cond.R. 1.1 (requiring an attorney to provide competent representation to a client), 1.2(a) (requiring a lawyer to abide by the client's decisions concerning the objectives of the representation and consult with the client as to the means by which the objectives are pursued), 1.3 (requiring an attorney to act with reasonable diligence), 1.4(a)(1) (requiring a lawyer to promptly inform a client of any decision or circumstance with respect to which the client's consent is required), 1.5(a) (requiring a lawyer not to make an agreement for, or to collect, an illegal or clearly excessive fee), 1.5(c)(2) (requiring a lawyer entitled to a contingency fee to provide a closing statement to the client at the time of or prior to receipt of that fee), 1.15(b) (prohibiting a lawyer from depositing the lawyer's own funds in a client trust account except to obtain a waiver of a bank service charge), 1.16(a)(3) (requiring a lawyer not to represent a client after the lawyer has been discharged), and 8.4(c) (requiring a lawyer not to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR 1-102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 6-101(A)(3) (prohibiting neglect of an entrusted legal matter), 7-101(A)(1) (prohibiting a lawyer from intentionally failing to seek the lawful objectives of his client), 7-101(A)(2) (prohibiting a lawyer from intentionally failing to carry out a contract of employment for legal services), and 7-101(A)(3) (prohibiting a lawyer from damaging or prejudicing a client during representation).

**{¶ 6}** In light of the number and seriousness of the violations, the panel and board recommended that Sigalov be disbarred. For the reasons that follow,

2

we adopt the board's findings of fact, conclusions of law, and recommended sanction.

**Misconduct**

*Count I*

{¶ 7} In April 2007, one of respondent's employees, who was not licensed to practice law, met with a man who was receiving treatment at a chiropractic clinic for injuries sustained in a motor-vehicle accident. The client signed a written contingency-fee agreement stating that Sigalov would represent the client in a claim for damages sustained as a result of the accident in exchange for 24 percent of any amount Sigalov recovered. The client claimed that he had never received a copy of the agreement.

{¶ 8} Sigalov did not personally meet the client at any point during the representation. He made a settlement demand of $21,500, which the client did not authorize. The demand included nearly $4,000 for medical expenses, but did not include a claim for lost wages, even though Sigalov's records clearly showed that the client had missed work due to his injuries.

{¶ 9} Sigalov settled the claim for $8,200. He paid himself $2,658, a figure that represents more than 32 percent of the settlement and $690 more than the 24 percent to which he was entitled under the fee agreement.

{¶ 10} Sigalov testified that the client had given him oral authorization to sign the client's name to the settlement check. But the client denied having approved the settlement. A schedule of expenses and deductions that Sigalov claims was approved by the client contains only the initials "OS" on the signature line, which are not the client's initials.

{¶ 11} Sigalov issued the client a check for $2,884 after paying himself and the chiropractic clinic $2,658 each. Sigalov, however, did not pay the medical expenses that the client had incurred in seeking treatment for his injuries. As a result, the client was responsible for those bills.

**{¶ 12}** The client refused to cash the settlement check. He retained new counsel, who was able to reopen the settlement and obtain an additional $3,800 from the insurer. New counsel requested that Sigalov return the excess fees collected from the client. Sigalov testified that he did so, but new counsel never received that check. The client died before receiving any benefits from the settlement.

**{¶ 13}** The panel found by clear and convincing evidence that Sigalov's misconduct in Count I violated Prof.Cond.R. 1.2(a), 1.4(a), and 1.5. The panel noted that it would have also found a violation of Prof.Cond.R. 1.5(a) had Sigalov been provided with notice in the complaint of that charge.

### *Count II*

**{¶ 14}** The allegations in the second count arise from Sigalov's representation of a client who is a citizen of the Republic of Uzbekistan. The client wanted to obtain legal status to remain in the United States after she married an American citizen.

**{¶ 15}** Because the client's notice of her change of address was not received by proper immigration authorities, the client missed a mandatory status hearing that had been set for December 7, 2006. In May 2007, the client was arrested and detained, and an order of removal from the United States was issued based on her failure to appear at the December hearing. The client's husband retained Sigalov on May 7, 2007, to obtain her release by filing a motion to reopen.

**{¶ 16}** The motion to reopen was vital because it serves as an automatic stay of the deportation order and ensures that the client was not kept in confinement and deported. Sigalov accepted a $500 retainer fee and secured the client's release by advising the immigration authorities that he represented her.

**{¶ 17}** On May 9, 2007, Sigalov mailed a document purporting to be a motion to reopen to the immigration court. The "motion," however, was fatally defective. Consisting of only three sentences, the motion failed to include certain

essential elements, such as an affidavit from the client attesting that she had not attended the hearing because she had not received notice. As the panel explained:

> To call Sigalov's Motion to Reopen "bare bones" is to give it too much credit. The motion contained no meaningful statement of facts, background, or procedural history. The motion contained no legal analysis or research. It did not discuss the necessary legal issues in order to obtain the reopening of the case. Further, the Motion to Reopen did not contain any of the necessary affidavits or exhibits to support it. Finally, Sigalov's motion was procedurally defective for several reasons, including no proof of service on the adverse party.

{¶ 18} The immigration court refused to accept the motion because it did not comply with local rules of the court. In fact, the immigration court cited several rules that were not followed, including the rule requiring service of the motion on the opposing party, the Department of Homeland Security ("DHS").

{¶ 19} Sigalov testified before the panel in this case that he knew that the motion to reopen had to include an explanation for his client's failure to appear at the status hearing, evidence such as affidavits, and a legal argument. He also admitted that he was unsure whether he had ever reviewed his client's immigration file, which was available to him. Thus, the panel concluded that Sigalov had either intentionally ignored the requirements for the motion or had lied to the panel when he said he knew what the requirements were when he filed the motion.

{¶ 20} In any event, upon the court's refusal to accept the motion, Sigalov did not act appropriately. Despite the need for a timely refiling, he neither addressed the deficiencies in the motion nor informed the client that the motion had been rejected. In fact, when questioned by the client several times about the

motion between May and August 2007, Sigalov falsely informed the client that the motion had been filed and was pending.

{¶ 21} The client grew increasingly concerned about Sigalov's candor and contacted another immigration attorney. That lawyer checked with the immigration court, learned that no motion was pending, and informed the client of that information. The client immediately contacted Sigalov, who only then acknowledged that the motion had been rejected. But he falsely claimed that another motion had been filed and thereafter misrepresented to the client that he had checked on the motion at the court and that it was pending. The client terminated Sigalov's representation.

{¶ 22} Despite having been informed by his client that she was seeking and retaining new counsel, Sigalov mailed a second motion to reopen to the immigration court, which received it on September 6, 2007. The second motion was almost identical to the rejected motion, including the failure to properly serve counsel for DHS. The motion was again returned to Sigalov without being filed by the court.

{¶ 23} About ten days later, the client retained new counsel. New counsel informed Sigalov in writing that she had been retained and requested a copy of the complete case file. Sigalov complied with new counsel's request on September 19, 2007, but nevertheless, a week later, he mailed a third motion to reopen to the immigration court. Neither the client nor her new attorney was aware of the filing.

{¶ 24} Unfortunately for the client, even though this motion was as deficient as the two prior motions to reopen, the court accepted it for filing. In less than two weeks, the immigration court ruled on the motion. The memorandum order summarily stated: "Since [the client's] motion to reopen contains no evidentiary support beyond her attorney's assertions, the Court is precluded from addressing its merits." Accordingly, the immigration court denied the client's motion to reopen.

**{¶ 25}** The Code of Federal Regulations states that a party may file only one motion to reopen. 8 C.F.R. 1003.23(b)(1). Thus, when the client's new attorney attempted to file a proper motion to reopen, it was denied. Within days, the client was detained by immigration officials. Only through the extraordinary efforts of new counsel was this matter favorably resolved with the release of the client from detention.

**{¶ 26}** The panel found by clear and convincing evidence that Sigalov had violated Prof.Cond.R. 1.1, 1.3, 1.16(a)(3), and 8.4(c).

### *Count III*

**{¶ 27}** Count III of the complaint requires a more complicated analysis than the other counts.

**{¶ 28}** The panel found that Sigalov had violated Prof.Cond.R. 8.4(c) in two ways: by telling relator and the panel that he had notified the client of the new hearing when he had not and by telling the client that he had not received notice of the hearing when in fact he had. Sigalov argues that these findings are fatally tainted by the panel's improper granting of relator's motion to recall him as a witness after relator had rested its case, which he contends violated his procedural due process rights. We need not reach the constitutional issue, however, insofar as it relates to his misconduct toward his client, because even without the evidence obtained on recall, the record contains clear and convincing evidence of Sigalov's dishonesty with his client, which is more than sufficient to support the panel's finding on this count. As we shall see, however, the matter is more complicated as it relates to Sigalov's misconduct toward the panel.

### Sigalov's Misconduct with the Client

**{¶ 29}** The third count arises from an immigration matter in which Sigalov was retained by a client in August 2006. The client, who spoke little English and communicated with Sigalov in Russian, sought assistance with his asylum claims in the immigration court in Arlington, Virginia. On August 18,

2006, Sigalov filed a notice of appearance with the immigration court, and from that point onward, the court notified only Sigalov of the client's hearings.

{¶ 30} On March 27, 2007, Sigalov and the client appeared for a master hearing at the immigration court in Cincinnati, which had video conferencing with the immigration court in Virginia. Because the video equipment was not functioning properly, however, the hearing did not take place on that date.

{¶ 31} A new hearing date was set for June 26, 2007, but notice of the new date was sent to Sigalov only. Although Sigalov testified that his practice was to notify clients of all court dates by letter, the client in this case never received a letter from Sigalov with the June 26 date. And although Sigalov produced a copy of a letter, dated June 12, 2007, that he claims was sent to the client, relator contends that the letter is a fabrication.

{¶ 32} When Sigalov was recalled as a witness, relator presented evidence that the letterhead on Sigalov's copy was in a style that had not been produced by his printing company until August 13, 2007, two months *after* the date on the letter. When Sigalov offered no evidence in response, relator concluded that the letter was a fabrication designed to cover up Sigalov's failure to notify the client of the new hearing date.

{¶ 33} The client's lack of notice of the hearing date is significant. Because the client was not informed of the date, he did not appear. Instead, Sigalov appeared at the hearing alone, did not seek a continuance, informed the judge that the client was likely at home, and claimed that he had "no excuse" for his client's absence. Due to the client's failure to appear, the immigration court ordered that the client be detained and removed from the United States. The court sent notice to Sigalov, stating that the decision was final unless a motion to reopen was filed.

{¶ 34} The day after the hearing, the client learned that the hearing had already taken place. When the client called Sigalov, Sigalov told him that he would file an appeal. Sigalov's promise to appeal was inappropriate because the

8

notice from the court clearly stated that a motion to reopen was the proper mechanism to avoid detention and deportation. In any event, no timely appeal or motion to reopen was filed.

{¶ 35} It was not until eight months later that Sigalov filed what he purported to be an appeal. The substance of the "appeal," however, was two sentences stating merely that the client "did not receive notice of the master hearing[.] He did appear at all other scheduled hearings." No evidence or legal argument was included.

{¶ 36} Federal agents from Immigration and Customs Enforcement ("ICE") went to the client's home in January 2008, demanding to see his documents. The agents then escorted him to an immigration building in Columbus, fingerprinted and photographed him, gave him an additional 30 days to file a motion to reopen, and instructed him to return to the ICE office on March 3.

{¶ 37} The client immediately contacted Sigalov, who had him sign some new papers, which the client believed were for an appeal. Sigalov promised to appear at the immigration building in Columbus on March 3. When the client returned to the ICE office on that date, Sigalov did not appear, no motion to reopen had been filed, and the client was arrested immediately. The client spent the next five and a half months in detention.

{¶ 38} After being incarcerated, the client retained another lawyer. That attorney had to secure dismissal of the appeal, which had deprived the immigration court of jurisdiction, so that a motion to reopen could be filed.

{¶ 39} The panel found by clear and convincing evidence that Sigalov had violated Prof.Cond.R. 1.1, 1.2(a), 1.3, 1.4(a), and 8.4(c). The panel explained that the finding of a violation of Prof.Cond.R. 8.4(c) was based on misconduct other than the fabrication of the June 12 letter, which was not charged as misconduct in the complaint. The panel did conclude, however, without finding a violation, that the June 12 letter was a fabrication by Sigalov to conceal his failure to notify the

client of the new hearing date and relied on that fact in considering aggravation. The finding that Sigalov had violated Prof.Cond.R. 8.4(c) was based on the fact that Sigalov had told the client that he had not received notice of the hearing date when in fact he had and that he had told relator and the panel that he had notified the client of the hearing when he had not.

## Sigalov's Misconduct with the Panel
## and His Due Process Claim

{¶ 40} As noted above, the panel declined to find that Sigalov's fabrication of the letter violated Prof.Cond.R. 8.4(c) on the basis that the complaint had not provided notice of such a violation. But in recommending a sanction, the panel cited fabrication of evidence as a "significant" aggravating factor that "greatly exacerbate[s]" Sigalov's conduct. Sigalov contends that the panel's reliance on evidence of fabrication, which was introduced upon reopening after relator had rested its case, denied him his due process rights. Relator counters that it was proper to use that evidence to assess Sigalov's credibility and to determine the appropriate sanction.

{¶ 41} In considering Sigalov's claims, we begin with the law.

{¶ 42} In any disbarment proceeding, an attorney accused of misconduct is "entitled to procedural due process, which includes fair notice of the charge." *In re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), citing *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). "The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." *Ruffalo* at 551. The "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprive[d] [the attorney facing discipline] of procedural due process." *Id.* at 552.

{¶ 43} Sigalov contends that the panel's consideration of the letter violated due process because the complaint gave no notice that the letter's

10

authenticity was at issue. We reject this broad proposition insofar as it is directed toward the portion of Count III that arises from Sigalov's misconduct with the client, but we agree with Sigalov to the extent that it is aimed at the allegations arising from Sigalov's misconduct before the panel.

{¶ 44} Procedural due process requires only notice of the charges before the proceedings commence and an opportunity to be heard. It does not require that an attorney charged with misconduct be given notice, prior to presenting false evidence, that if he does present such false evidence, additional evidence will be submitted to the panel to impeach him.

{¶ 45} Moreover, Sigalov was clearly on notice that his failure to inform the client of the rescheduled hearing date was at issue in this case from the allegations set forth in the original complaint, which he received in October 2008—more than a year prior to the first hearing in this matter.[2] Sigalov is also specifically charged with violating Prof.Cond.R. 1.4(a) by failing to inform the client of his June 26, 2007 hearing date. There is no question that Sigalov was on notice that the failure to inform the client was at issue in this case, and no procedural due process right is violated by the panel's pursuit of that claim.

{¶ 46} Sigalov also contends that the panel violated his due process rights by finding a violation of Prof.Cond.R. 8.4(c) based on his dishonest statement to the panel and relator. Here, Sigalov's contention has merit. Additional charges of misconduct for violating Prof.Cond.R. 8.4(c) cannot be premised on an attorney's misleading disciplinary authorities during the investigation or proceedings unless the complaint makes such an allegation. *Disciplinary Counsel v. Simecek*, 83 Ohio St.3d 320, 322, 699 N.E.2d 933 (1998), quoting *In re Ruffalo,* 390 U.S. at 551, 88 S.Ct. 1222, 20 L.Ed.2d 117 (disciplinary charges " 'must be known before the proceedings commence' ").

---

2. Paragraph 34 of the original complaint states, "Sigalov did not mail a copy of the notice to [the client], but did send him a letter notifying him of the hearing date two weeks before the hearing. [The client] did not receive the letter."

**{¶ 47}** The complaint did not charge Sigalov with dishonest statements to the panel. Thus, as Sigalov asserts, under *Ruffalo* and *Simecek,* the requisite notice was lacking, and relator cannot bring a new Prof.Cond.R. 8.4(c) charge of dishonesty.

**{¶ 48}** But relator asserts that the evidence of dishonesty represented by the fabricated letter can still be considered for impeachment purposes, in assessing Sigalov's credibility, and as a factor in aggravation for purposes of any sanction imposed. Because even without the evidence of fabrication, the record amply supports by clear and convincing evidence the panel's finding that Sigalov violated Prof.Cond.R. 8.4(c), we need not address the constitutionality of the panel's distinction between bringing a new charge against Sigalov and using Sigalov's attempts to conceal his misconduct to impeach his credibility. This is consistent with our mandate that "[c]ourts decide constitutional issues only when absolutely necessary." *State ex rel. Essig v. Blackwell*, 103 Ohio St.3d 481, 2004-Ohio-5586, 817 N.E.2d 5, at ¶ 34, quoting *State ex rel. DeBrosse v. Cool,* 87 Ohio St.3d 1, 7, 716 N.E.2d 1114 (1999). And because Sigalov's fabrication of evidence does not enter into our Prof.Cond.R. 8.4(c) violation analysis, his constitutional due process claim does not affect our ruling. Instead, our decision on the third count is premised on Sigalov's misconduct relating to his client.[3]

**{¶ 49}** Sigalov undoubtedly violated his obligations to his client not only by failing to inform him of an important court date, but also by explicitly, and repeatedly, lying to him. We find that the record supports the panel's finding by

---

3. During the disciplinary hearing, the panel found by clear and convincing evidence that Sigalov had continually lied to the client by telling him that he had not received notice of a rescheduled hearing date, when in fact he had. When asked if his client had ever explained to Sigalov why he did not show up for the hearing, Sigalov admitted that the client "obviously didn't know about the hearing." Furthermore, Sigalov conceded that the client called him "at least once every two weeks" to find out if a new hearing date had been scheduled. Sigalov admits that the client had called "quite a few times" after he had received notice that the master hearing had been scheduled on June 26. Despite his knowledge of the June 26 hearing date, all the client heard from Sigalov was that "nothing is known yet."

clear and convincing evidence that Sigalov violated Prof.Cond.R. 8.4(c) with respect to Sigalov's dishonesty towards his client.

### Count IV

{¶ 50} The fourth count of the complaint arises from Sigalov's representation of a client who had been injured in a motor-vehicle accident. Relator alleged that although the representation was on a contingency-fee basis, Sigalov did not provide the required written agreement to that effect. Sigalov further failed to truthfully update the client about the status of the case, neglected her case, and made a settlement demand without her permission. Sigalov was unable to produce a copy of the contingency-fee agreement, but the client did not testify before the panel. The panel concluded that the relator had failed to demonstrate by clear and convincing evidence that Sigalov engaged in the misconduct alleged in the fourth count and recommended that it be dismissed. We accept that finding and do not consider the allegations set forth in Count IV in fashioning our sanction.

### Count V

{¶ 51} The fifth count alleges that Sigalov committed misconduct in his representation of clients who had been injured when a taxi struck their motor vehicle. At the time of the accident, the vehicle carried a grandmother, her two adult daughters, and her grandchild.

{¶ 52} The grandmother and one of her daughters retained Sigalov in late 2002 on a contingency-fee basis. Sigalov could not produce a copy of the agreement.

{¶ 53} After two years of minimal activity on the case, Sigalov sent a demand letter to the taxi's insurer on September 27, 2004. At that time, the statute of limitations was about to expire. Approximately two weeks later, the insurer offered $20,300 to settle the grandmother's claim and $7,000 to settle her daughter's claim. Without discussing the matter with his clients, Sigalov entered into settlement discussions, and the insurer then raised the settlement amounts to

$33,000 and $10,000, respectively. Although the record is not perfectly clear, it appears that the proposed settlement agreements were drafted without the clients' knowledge and approved without their permission. In any event, the settlement agreements and checks were sent to Sigalov. When Sigalov called the grandmother, she unequivocally rejected the settlement and subsequently informed him, in writing, of her refusal to settle for anything less than six figures.

{¶ 54} Sigalov sued the insurer shortly before the limitations period was to expire. But he informed the clerk of court that the claims had been settled and instructed the clerk not to serve the complaint because he did not want to disturb the alleged "settlement." Sigalov continued to block any effort to serve the complaint.

{¶ 55} In 2005, Sigalov dismissed the grandmother's suit without her knowledge or permission. He continued for some time to discuss the matter with the client without telling her that her claims had been extinguished. On June 16, 2008, Sigalov finally informed the client, via letter, that he had missed the statute of limitations and that she should proceed against his malpractice insurer.

{¶ 56} The panel found by clear and convincing evidence that Sigalov had violated DR 1-102(A)(4), 6-101(A)(3), 7-101(A)(1), 7-101(A)(2), and 7-101(A)(3), and Prof.Cond.R. 1.2(a), 1.3, 1.4(a), 1.16(a)(3), and 8.4(c). But the panel did not find clear and convincing evidence that Sigalov had violated DR 2-106(A) (prohibiting a lawyer from charging or collecting an illegal or clearly excessive fee) or Prof.Cond.R. 1.5(c)(1) (requiring a lawyer to put a contingency-fee agreement in writing) or 1.5(c)(2). The board adopted the panel's findings.

{¶ 57} We agree that there is clear and convincing evidence of the misconduct found by the panel and the board, and we adopt their findings.

### Count VI

{¶ 58} The sixth count arises from Sigalov's representation of a client who had fled the Republic of Georgia to seek asylum in the United States.

**{¶ 59}** The client testified that acting in his official capacity in his native Georgia, he had stopped a robbery in progress. Several of the perpetrators were former KGB agents, who threatened the client and his family with retaliation if the client called the police and testified against them. The client nevertheless testified. After he did so, his son was kidnapped and beaten and tortured for three days before being released. The client and his family subsequently fled Georgia.

**{¶ 60}** After arriving in this country in September 2002, the client sought asylum. Initially, he represented himself.

**{¶ 61}** Sigalov agreed to represent the client in November 2006. From the outset, Sigalov's performance was problematic.

**{¶ 62}** The client testified that he had paid Sigalov $1,400 as a retainer. Sigalov contended that the client paid him $1,100, out of which Sigalov paid a $110 filing fee for the appeal. But Sigalov acknowledged that he could not be certain of the amounts, because he had no receipts or other documentation.

**{¶ 63}** At some point, the immigration authorities issued an order of removal for the client and his family. After Sigalov assumed representation of the client, the immigration court set the case for an evidentiary hearing in September 2007. Despite the fact that Sigalov had approximately ten months to prepare for the hearing, he failed to do so.

**{¶ 64}** Sigalov raised three defenses to the order of removal: asylum, withholding of removal, and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. But he did not perform legal research to prepare for the hearing, did not explain to the client what documentation would be needed to prevail on his claim, and did not discuss any theories with the client. In fact, Sigalov met with the client only twice— including a meeting on the morning of the hearing. On that day, the client presented Sigalov with documents supporting his claims, but the documents were written in Georgian and could not be translated in time for the hearing. The only evidence Sigalov presented at the evidentiary hearing was the client's

uncorroborated testimony. Not surprisingly, the immigration court deemed that testimony insufficient and denied the application for asylum and for withholding of the removal order.

{¶ 65} In affirming the immigration court's ruling, the Board of Immigration Appeals reached a similar conclusion, noting in its opinion that little had been done to challenge the immigration court's decision and that the case for asylum had not been proved. The panel hearing this case reached the same conclusion, that is, that "Sigalov did little besides collecting a retainer, showing up for the hearing, and winging it." Indeed, Sigalov's appellate brief was a mere three paragraphs, repeating a few facts and describing the client's fears, with no legal analysis whatsoever. When asked about the sufficiency of Sigalov's appeal, the relator's immigration expert responded:

> I'm not sure I would dignify calling that a brief. It cites no law. It doesn't go into a discussion of the facts. It doesn't try to link a nexus between one of the enumerated grounds. I'm not sure, looking at it again, I don't think it even has any discussion as to the one-year requirement. And certainly it doesn't differentiate between the various forms of relief of asylum, withholding or [the] Convention Against Torture.

The expert appropriately summarized Sigalov's representation: "It is not diligent for the same reasons I have said. Certainly, the submission of exhibits and documents for the case were sparse and then the appeal brief was perfunctory almost to the point of insult."

{¶ 66} Sigalov's breathtakingly poor representation was fatal to his client's claims. As relator's expert explained:

A brief on an asylum case like [this one] would have, of course, just the summary of the procedural posture, how it got there; a statement of the issues, which basically in that case were the one-year filing deadline and then the qualification of the relief; legal argument as to why, in fact, the immigration judge erred in not giving enough weight to the credible testimony and holding that person had a well-founded fear of persecution and that is why citing *Cardoza-Fonseca* [*Immigration & Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)] and the 10 percent rule would be hammered inasmuch as possible.

Then, of course, you know, at the conclusion trying to convince the board—or certainly the staff attorneys who read it first at the board that you have got something there worthy to look at.

{¶ 67} The panel found by clear and convincing evidence that Sigalov had violated Prof.Cond.R. 1.1, 1.3, and 1.5(a). We agree and adopt the panel's finding.

### Count VII

{¶ 68} The last count arises from Sigalov's representation of a client who had been injured in a motor-vehicle accident on November 30, 2007. The client retained Sigalov on a contingency-fee basis in early December 2007. Nearly a year later, without discussing it with the client, Sigalov wrote the other driver's insurer, asserting that liability was clear and should not be contested. Although the client was in dire financial need and had told Sigalov that she had lost wages as a result of the accident, Sigalov did not seek recovery for lost wages and sought only $6,135.75 in damages for medical bills associated with treatment for injuries sustained from the accident. When Sigalov informed the client that the insurer

had offered $5,800 to settle all claims, the client stated that the offer was too low. When Sigalov informed her that the offer was all she could get, the client accepted a $4,000 check from Sigalov.

{¶ 69} The check was written on Sigalov's IOLTA account, as were two others—one to Sigalov himself and the other to one of the client's medical providers. The three checks totaled $5,800—the full amount of the settlement—but Sigalov had not yet received any settlement proceeds from the insurance carrier when he issued the checks. Sigalov testified that he keeps personal funds in his IOLTA account to cover checks he writes before he actually receives settlement proceeds.

{¶ 70} When Sigalov gave the client her settlement check, he also presented her with a number of other papers that were stapled together. The client did not focus on those papers at the time, but later realized that the papers may have included a schedule of expenses and deductions. The schedule accurately indicated that the client, one medical provider, and Sigalov had been paid from a gross settlement amount of $5,800. Although the schedule also included a signature that was purported to be hers, the client testified that it was a forgery. She also testified that her signature had been forged on a power of attorney that was used by Sigalov to settle the case and that her signature was forged on a document stating that she would be responsible for the outstanding medical bills.

{¶ 71} In addition, the client testified that Sigalov had lied to her when he stated that a mediation had been canceled due to a death in the mediator's family. That statement was not true, as Sigalov admitted.

{¶ 72} The panel did not find clear and convincing evidence that Sigalov had violated Prof.Cond.R. 8.4(c) by lying about the cancellation of the mediation. Nor did it find by clear and convincing evidence that he had violated Prof.Cond.R. 1.15(a) by improperly disbursing funds from the IOLTA to the client. But it did find by clear and convincing evidence that Sigalov had violated Prof.Cond.R. 1.15(b) by depositing his own funds into a client trust account. The

panel stated that it would have found a violation of Prof.Cond.R. 8.4(c) for forging the client's signature if the complaint had provided notice of any such charge.

{¶ 73} We now turn to the legal ramifications of Sigalov's misconduct.

**Mitigation**

{¶ 74} In considering any sanction, we consider the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). The panel found a single factor in favor of mitigation: pursuant to BCGD Proc.Reg. 10(B)(2), Sigalov has no prior disciplinary record. The board adopted that finding, as do we.

{¶ 75} The panel rejected Sigalov's suggestions of additional mitigating factors. First, Sigalov contends that he made a full and voluntary disclosure to the panel and board and had a cooperative attitude toward the proceedings. But as the panel recognized, despite Sigalov's superficially cooperative attitude, he gave false testimony and submitted false evidence in these proceedings. That misconduct cannot be depicted as full and free disclosure or as cooperative with the process. To the contrary, the misconduct impeded, rather than assisted, the panel in reaching a full and fair understanding of the incidents and representation at issue here. Sigalov's actions in providing false testimony and evidence are plainly aggravating rather than mitigating. His assertions to the contrary border on the preposterous.

{¶ 76} Next, Sigalov asserts that he has suffered the imposition of other penalties or sanctions outside the disciplinary process because he was sued for malpractice by one of the clients at issue in this case. The panel found that the cases cited by Sigalov in an effort to support his contention, *Disciplinary Counsel v. Gittinger,* 125 Ohio St.3d 467, 2010-Ohio-1830, 929 N.E.2d 410, and *Cleveland Metro. Bar Assn. v. Nance,* 124 Ohio St.3d 57, 2009-Ohio-5957, 918 N.E.2d 1000, were not apposite. The board adopted that conclusion, and we agree.

**{¶ 77}** In *Gittinger*, there were multiple mitigating factors, including evidence of good character, full cooperation in the disciplinary process, lack of personal gain, and a one-time violation rather than a pattern of misconduct. *Id.* at ¶ 41, 47. In *Nance*, mitigating factors included the imposition of other penalties or sanctions and the lack of prejudice to the respondent's clients. *Id.* at ¶ 13. Here, Sigalov's clients were all seriously harmed by his misconduct, and his misconduct continued over the course of many years. Furthermore, Sigalov profited through his misconduct by accepting his clients' fees and doing little to no work on their cases.

**{¶ 78}** Moreover, although his clients may obtain restitution through a malpractice action, the public is still left unprotected. We reject the notion that a malpractice claim is a punishment or sanction that somehow operates to mitigate Sigalov's misconduct.

**{¶ 79}** Finally, Sigalov states that he intends to cease practicing immigration law. This professed moratorium is specious. It is proffered only in the wake of what is at best grossly negligent conduct. We do not believe that the public will be protected by Sigalov's promise to stop practicing immigration law. And the pledge to give up his immigration practice does nothing to address Sigalov's repeated misconduct in personal-injury cases, which comprise an even more substantial portion of his practice.

### Aggravation

**{¶ 80}** Pursuant to BCGD Proc.Reg. 10(B)(1), the panel found six aggravating factors: (1) a dishonest or selfish motive, (2) a pattern of misconduct, (3) multiple offenses, (4) the submission of false evidence, false statements, or other deceptive practices during the disciplinary process, (5) a refusal to acknowledge the wrongful nature of the misconduct, and (6) the vulnerability of and resulting harm to victims of the misconduct. The board adopted these findings, and we agree.

{¶ 81} Much of Sigalov's misconduct resulted from accepting clients' fees and then doing little or nothing to earn the fee. Sigalov filed inadequate briefs, pursued incorrect legal action, and routinely neglected cases. He repeatedly lied to clients about the progress or status of their cases and conducted settlement discussions on their cases without their knowledge or consent.

{¶ 82} Furthermore, Sigalov committed multiple offenses over a long period of time, from a personal-injury case in 2002 to an immigration case in 2007. During that time, he violated multiple rules of professional conduct with a variety of different clients. One of Sigalov's clients died before ever seeing the proceeds that resulted from his case. Almost all of Sigalov's clients eventually sought new counsel to help them recover from the array of additional legal problems they faced due to his significant misconduct.

{¶ 83} During the proceedings before the panel, Sigalov showed no remorse for his misconduct, maintaining even now that the complaint should be dismissed with prejudice. Furthermore, Sigalov submitted false evidence to the panel in an effort to remove the blame from himself and place it on his clients.

{¶ 84} We are also mindful that many of Sigalov's clients were unusually vulnerable. Our sister courts have recognized that immigration clients often have a heightened susceptibility to attorney misconduct due to language barriers and unfamiliarity with the legal system. *See, e.g., People v. Beasley*, 241 P.3d 548, 553 (Colo.2010). As further explained by the Tennessee high court in *Flowers v. Bd. of Professional Responsibility*, 314 S.W.3d 882, 899 (Tenn.2010), clients in immigration proceedings often face a variety of special difficulties due not only to language problems, but also to limited financial means, lengthy work hours, lack of transportation, and ignorance of the larger culture. "The importance of quality representation is especially acute to immigrants, a vulnerable population who come to this country searching for a better life, and who often arrive unfamiliar with our language and culture, in economic deprivation and in fear." *Aris v. Mukasey*, 517 F.3d 595, 600 (2d Cir.2008).

**{¶ 85}** Russian-speaking immigrants sought out Sigalov because he speaks Russian. Instead of helping them, he took their money and did nothing, leaving them to deal with the consequences, including arrest and detention.

**{¶ 86}** Here, Sigalov selfishly took advantage of immigrant clients who were particularly susceptible to victimization. He repeatedly assured his clients that he was filing motions on their behalf or otherwise working on their cases when in fact he was doing nothing. Because Sigalov's clients were immigrants, two of whom barely spoke English, their understanding of the legal process was minimal, and they were forced to rely entirely on Sigalov's false representations that he was doing what was necessary for their cases. One of Sigalov's clients was almost deported, and another was unnecessarily incarcerated for five and a half months.

**{¶ 87}** Sigalov's other clients were often vulnerable as well. Sigalov admitted that many of his clients are people of limited financial means. In Count VII, the client was about to lose her house and desperately needed money. Sigalov pressured her into settling for an amount that she did not approve and that did not include compensation for wages lost. Another client died before receiving one penny of a settlement to which he was lawfully entitled.

**{¶ 88}** The evidence of mitigation in this case consists only of Sigalov's lack of a prior disciplinary record. Given the severity of the multiple offenses at issue in this case, *see* BCGD Proc.Reg. 10(B)(1)(d), that mitigation is minimal at best.

**{¶ 89}** Conversely, the weight of aggravation is substantial. Not only did Sigalov act with a dishonest or selfish motive, BCGD Proc.Reg. 10(B)(1)(b), but he also presented false evidence and false testimony to the panel. BCGD Proc.Reg. 10(B)(1)(f).

**{¶ 90}** The egregiousness of Sigalov's misconduct is plain. But even after the extent of his derelictions was brought to light, he continued to insist that he

has done little wrong, going so far as to request that the complaint be dismissed with prejudice.

{¶ 91} Like the panel and board, we are troubled by Sigalov's failure to appreciate the gravity of his misconduct. His refusal to acknowledge the harm he caused his clients is appalling. When an attorney engages in multiple wanton acts of misconduct for years, lies to multiple clients about their cases, falsifies documents in a cover-up effort during the disciplinary proceeding, and then denies the wrongful nature of his misconduct, the aggravating factors greatly outweigh those in mitigation.

### Sanction

{¶ 92} When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21. Because each disciplinary case is unique, we are not limited to the factors specified in the rule but may take into account "all relevant factors" in determining what sanction to impose. BCGD Proc.Reg. 10(B); *Ohio State Bar Assn. v. Peskin*, 125 Ohio St.3d 244, 2010-Ohio-1811, 927 N.E.2d 598, ¶ 11.

{¶ 93} The primary purpose of the disciplinary process in Ohio is to "protect clients and the public, to ensure the administration of justice, and to maintain the integrity of the legal profession." *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 32. Our goal in imposing disciplinary sanctions is not to punish the offender but to protect the public. *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. Our disciplinary action in this case bears that purpose in mind.

**{¶ 94}** The scope and magnitude of Sigalov's misconduct, encompassing fraud, gross neglect, duplicity, incompetence, and the fleecing of clients, are truly egregious. We have little trouble concluding that nothing less than Sigalov's disbarment will protect the public and maintain the integrity of the profession.

**{¶ 95}** Accordingly, Sigalov is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to Sigalov.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Gerhardstein & Branch Co., L.P.A., and Jennifer L. Branch; and Graydon, Head & Ritchey, L.L.P., and John B. Pinney, for relator.

Dinsmore & Shohl, L.L.P., Mark A. Vander Laan, and Mark G. Arnzen Jr., for respondent.

_____