**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1182n.06

**Nos. 11-3428 & 11-4380**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Nov 15, 2012*

DEBORAH S. HUNT, Clerk

DINARA BERTURSUNOVNA ALYMOVA,

  Petitioner,

v.

ERIC H. HOLDER, Jr., Attorney General,

  Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW FROM
FINAL ORDERS OF THE BOARD OF
IMMIGRATION APPEALS

Before: SILER, COLE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Dinara Bertursunovna Alymova, a citizen of the Kyrgyz Republic (often called Kyrgyzstan), seeks review of two orders of the Board of Immigration Appeals, one dismissing her applications for asylum, withholding of removal and protection under the Convention Against Torture, the other denying her motion to reopen these applications. We deny both petitions.

I.

In 1991, Kyrgyzstan declared independence from the Soviet Union. Later that decade, Alymova, a language instructor at a university in Kyrgyzstan, became involved in politics. In January 2000, she joined the Ar-Namys party, a group that opposed then-president Askar Akayev.

Not long after joining the party, she allegedly suffered abuse on account of her political views. On her way home from a party meeting, two plainclothes security officers stopped her and told her to stay out of politics. A few days later, the same officers accosted her again, telling her she would have "real . . . trouble" if she continued to associate with Ar-Namys. No. 11-4380, Admin. Rec. [A.R.] 36. The officers later spotted her in a crowd of Ar-Namys protesters at a March 2000 rally. Alymova claims the men pushed her to the ground, breaking her arm and causing a large scar on her leg. While recovering from these injuries, she alleges that her supervisor at the university forced her to resign from her job.

In April 2000, she obtained a tourist visa to the United States and left Kyrgyzstan the next month. She extended that visa once, allowing her to remain in the United States until May 2001. May 2001 came and went, and Alymova stayed.

In March 2003, Alymova applied for asylum, withholding of removal and protection under the Convention Against Torture. The immigration judge denied her applications, and the Board of Immigration Appeals dismissed her appeal. She filed a motion to reopen proceedings, but the Board denied it.

II.

At stake are two decisions by the Board: its March 2011 order dismissing Alymova's applications for withholding of removal and protection under the Convention Against Torture (No.

11-3428); and its November 2011 order denying her motion to reopen her application (No. 11-4380). Regrettably for Alymova, she is not entitled to relief from either decision.

A.

To be eligible for withholding of removal, an alien must demonstrate that she would be subject to persecution on account of her race, religion, nationality, membership in a particular social group or political opinion if forced to return to her home country. 8 C.F.R. § 1208.16(b). We give independent and fresh review to the Board's legal conclusions, *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009), and we treat its factual findings as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B); *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004).

Even if for the sake of argument we accept Alymova's credibility, as the Board did, the evidence does not compel us to conclude that she will suffer persecution if she returns to Kyrgyzstan. Alymova's central allegation is that she was attacked by security forces who answered to President Askar Akayev. Yet Akayev was overthrown in 2005. As a result of an April 2010 coup and October 2010 elections, the Ar-Namys party—Alymova's party—has become an influential member of the governing coalition. *See* No. 11-4380, A.R. 84, 88 (stating that Ar-Namys finished third out of twenty-nine parties in the "fairest election in the history of Central Asia" and that the country now has procedural rules "designed to protect the interests of minority parties"); *id*. at 89 (mentioning Ar-Namys as one of five parties represented in parliament). The record, indeed, shows that Ar-Namys

has enough control over the reins of power that *its* members of parliament "are now the main advocates of xenophobic decisions" against the party's opponents. *Id*. This evidence does not lead to the conclusion, let alone compel the conclusion, that Alymova will suffer persecution if she returns to Kyrgyzstan. She is not entitled to withholding of removal.

Alymova's claim under the Convention Against Torture faces a similar roadblock. To obtain relief, Alymova bears the burden of establishing that "it is more likely than not . . . that she will be tortured if removed to" Kygryzstan. 8 C.F.R. § 1208.16(c)(2). As with her request for withholding of removal, this claim hinges on her status as a member of Ar-Namys. The claim thus fails for the same reasons.

Hold on, Alymova insists: the Board failed to consider evidence that she will face persecution in Kygryzstan based on her marriage to Sergey Vasilev, a Russian Jew. According to Alymova, a "mixed marriage" like hers is "unheard of" and "will most certainly" cause her to face persecution in Kyrgyzstan. Pet'r Br. at 24–25. For one thing, it is not clear Vasilev is Jewish. On his 2001 asylum application, Vasilev listed his religion as "Christian." No. 11-4380, A.R. 9. For another, it is not clear that Alymova would be persecuted on the basis of her marriage. Alymova points to expert testimony that she would face persecution based on the marriage, *see id*. at 185–86, but the government points to the lack of evidence in the record that Russians or participants in mixed marriages have suffered mistreatment in Kyrgyzstan, *see, e.g.*, *id*. at 103, 118 (describing violence against ethnic Uzbeks but making no mention of discrimination against Russians). In point of fact, we previously denied Vasilev's own application for withholding of removal on the grounds that

Russians are not persecuted in Kyrgyzstan. *Vasilev v. Holder*, 366 F. App'x 585, 590 (6th Cir. 2010). Nor in truth did Alymova's expert say that participants in mixed marriages suffer persecution; he testified that mixed marriages are "unheard of." No. 11-4380, A.R. 185–86. Such conflicting evidence and speculation are precisely the kinds of things that make it difficult to, and do not compel us to, reverse a Board determination.

B.

Alymova adds that the Board should have granted her motion to reopen her asylum application because her attorney's ineffective assistance caused her to file the application two years too late. Abuse-of-discretion review applies to this argument. *INS v. Doherty*, 502 U.S. 314, 322 (1992).

Before the Board may reopen an immigration application based on ineffective assistance of counsel, an alien must present an affidavit detailing her lawyer's failings, share that information with her lawyer and file disciplinary charges with the appropriate authority. *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006). The parties agree that Alymova meets these initial procedural hurdles. She filed an affidavit stating that she paid her lawyer, Vlad Sigalov, to provide advice about asylum, and he never told her about the one-year limit. She told Sigalov about his shortfalls and reported him to the Ohio Supreme Court. Sigalov was later disbarred. *See Cincinnati Bar Ass'n v. Sigalov*, 975 N.E.2d 926 (Ohio 2012).

But that is not all there is. Alymova also must show that she suffered prejudice from her counsel's failings: that if she had received better legal advice, she would have been eligible for asylum. *Sako*, 434 F.3d at 863. Not every form of harassment rises to the level of persecution, an "extreme concept that does not include every sort of treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004). "[A]ctions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005). By Alymova's own account, she experienced repeated verbal harassment and was pushed to the ground after a political rally, breaking her arm and scarring her leg. We have held that similar—indeed, more severe acts—do not establish persecution. *See, e.g.*, *Mohammed v. Keisler*, 507 F.3d 369, 371 (6th Cir. 2007) (finding no persecution after petitioner was held in police custody for three days and slapped and kicked); *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006) (same, after petitioner was attacked and beaten during a kidnapping attempt); *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004) (same, after petitioner was detained for two week-long periods and, in a third incident, was beaten by police, resulting in head injuries and a week-long hospital stay); *Mullai v. Ashcroft*, 385 F.3d 635, 637–39 (6th Cir. 2004) (same, after petitioner was beaten and kicked by police and detained in a jail for two days without food or water).

Alymova also contends that she may have even lost her job on account of her political views. This too, we have held, does not suffice to demonstrate persecution. *See, e.g.*, *Japarkulova v. Holder*, 615 F.3d 696, 700–02 (6th Cir. 2010) (finding of persecution not compelled after petitioner

was fired from her job and received a death threat from a government security officer). In view of these precedents, we cannot say that Alymova's mistreatment *compels* a finding of persecution.

Even if Alymova could show past persecution, she faces another hurdle. She would not qualify for asylum if a "fundamental change in circumstances" in Kyrgyzstan makes it unlikely that she will be persecuted on account of her political views. 8 C.F.R. § 1208.13(b)(1)(i)(A). As we explained above, her political party, Ar-Namys, has been a part of Kyrgyzstan's governing coalition since October 2010. The Board thus acted well within its discretion when it found that changes in Kyrgyzstan create "no basis to conclude" Alymova could have succeeded on an asylum claim. No. 11-4380, A.R. 4.

For her part, Alymova contends that she still will face persecution. But even she admits that "persecution in Kyrgyzstan has decreased," Pet'r Br. at 35, and she has presented no evidence that the current government persecutes members of the Ar-Namys party. Nor has she presented clear-cut evidence that she would be persecuted because of her marriage. Thus, even if Alymova had filed a timely asylum claim, she would not have succeeded.

Last of all, Alymova argues that her due-process rights were violated because she appeared before the immigration judge by videoconference. We disagree. Due process requires only that aliens receive a full and fair hearing in deportation proceedings. *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). Nothing prevents an immigration judge from conducting that full and fair hearing by videoconference. *See Garza-Moreno v. Gonzales*, 489 F.3d 239, 241–42 (6th Cir. 2007)

(finding no due-process violation from an immigration hearing held by videoconference); *see also*

*Eke v. Mukasey*, 512 F.3d 372, 382 (7th Cir. 2008) (noting that no court has held that a

videoconference immigration hearing violates due process).  The transcript shows that Alymova was

able to communicate fully and effectively with the immigration judge.  Due process requires nothing

more.

III.

For these reasons, we deny Alymova's petitions.